# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| CHRISTOPHER OGDEN, on behalf of himself and all others similarly situated,<br><br>               Plaintiff,<br>   v.<br><br>LITTLE CAESAR ENTERPRISES, INC., a Michigan Corporation; LC TRADEMARKS, INC., a Michigan Corporation,<br><br>              Defendants. | Case No.:<br><br>**Class Action Complaint**<br><br>**Jury Trial Demanded** |

## CLASS ACTION COMPLAINT

Plaintiff, CHRISTOPHER OGDEN, on behalf of himself and all others similarly situated, with knowledge as to his own actions and events, and upon information and belief as to other matters, alleges as follows:

## NATURE OF THE ACTION

1.      This action challenges, under Section 1 of the Sherman Act, an employee no-poach and no-hiring agreement orchestrated by Defendants Little Caesar Enterprises, Inc. and LC Trademarks, Inc. (together, "Defendants" or "Little Caesar") between and among Little Caesar restaurant franchisees, pursuant to which the franchisees agreed not to solicit, poach or hire each other's management employees.  Little Caesar orchestrated, designed, dispersed, and enforced the policy among all franchisees, at least in part, through explicit contractual agreements (and remedies for violation) in standard franchise documents.  The practice at issue reflects a naked restraint of competition and a *per se* violation of the antitrust laws.

2.      Little Caesar calls itself the fastest growing pizza company in the United States.  It has stores in all 50 U.S. states and in multiple international markets.

3.      According to Little Caesar's 2017 Franchise Disclosure Document (the "FDD"), approximately 88% of its more than 4,300 U.S. stores are franchise restaurants.   Franchise restaurants are independently owned and operated by franchisees, who have executed a standard form franchise agreement with Little

Caesar.  Franchisees are separate and distinct legal entities from Little Caesar.  The standard initial franchise fee is currently $20,000.  Franchisees are responsible for other fees as well, and agree to pay to Little Caesar royalties of up to 6% of gross sales per week and advertising fees equal to 7% of gross sales.

4.     Plaintiff and the Class are current and former management employees of Little Caesar franchise restaurants. Plaintiff and the Class suffered reduced wages and benefits and diminished employment opportunities as a result of the unlawful contract, combination, or conspiracy alleged herein.

5.     Little Caesar designates a portion of its corporate website to franchising information.  It refers to itself as an "international brand that's a household name and a front-of-mind decision when you've got pizza on the brain."[1]  Further, Little Caesar "never underestimate[s] our competition" and "rigorously safeguard[s] our proprietary information and trade secrets."[2]  Little Caesar boasts that it is "zealously frugal" so it can "do more with less."[3]  It refers to its "simple operating system that works," which allows franchisees to "focus" on "growing their business."[4]

_____

[1]     *See* https://littlecaesars.com/en-us/join-our-brand/careers  (last visited August 30, 2018) (Exhibit 1).
[2]     *Id.*
[3]     *Id.*
[4]     *See*   https://littlecaesars.com/en-us/join-our-brand/franchise   (last   visited August 30, 2018) (Exhibit 2).

6.     But as part of the system that has made Little Caesar the fastest growing pizza company in the United States, Little Caesar franchisees, at the direction of and with the assistance of Little Caesar itself, have together colluded to suppress the wages and employment opportunities of the restaurant-based management employees who work at Little Caesar franchise locations throughout the United States.

7.     In particular, beginning no later than 2009, Little Caesar franchisees contracted, combined, and/or conspired to not solicit, poach, or hire each other's management employees.  This agreement was evidenced by franchisees' written pledge in Paragraph 15.2.3 of their franchise agreements to not:

> Employ or seek to employ, directly or indirectly, any person serving in a managerial position who is at the time or was at any time during the prior six (6) months employed by Little Caesar or its affiliates, or a franchisee of any restaurant concept franchised by Little Caesar or its affiliates, without the prior written consent of the then-current or prior employer.

Every franchisee signing a franchise agreement prior to March 31, 2017 made this same agreement.

8.     Each franchisee signing a franchise agreement in 2009 and 2010 further agreed that "Violations of the [above provision] shall entitle the prior employer to liquidated damages equal to twice the annual salary of the employee (while employed by the prior employer), plus reimbursement of all costs and attorney fees incurred.  A prior employer shall be deemed to be a third-party beneficiary of this

[provision], with an independent right to bring an action based upon a violation hereof." Franchisees signing franchise agreements earlier than 2009 likely made the these same or similar agreements, as did franchisees who signed franchise agreements up until 2014.[5]

9.      In addition to the onerous remedies set out above, each franchisee also agreed Little Caesar may terminate the franchise of a franchisee who violated the no-poach provision, thus triggering forfeit of the franchisee's initial franchise fee, along with other post-termination penalty provisions.

10.     The Little Caesar no-hire agreement is an unreasonable restraint of trade.

11.     As the Department of Justice ("DOJ") Antitrust Division and Federal Trade Commission's ("FTC") joint *Antitrust Guidance for Human Resource Professionals* (October 2016) states: "Naked wage-fixing or no-poaching

---

[5]      As described in Paragraphs 40 and 59-84, *infra*, at some time after 2010, Little Caesar changed the language of Paragraph 15.2.3 of the franchise agreement by removing – on a going-forward basis for newly signed franchise agreements – the language that specifically labeled other franchisees as "third party beneficiaries" entitled to liquidated damages and an independent right of action. Effective March 31, 2017, it – again, on a going-forward basis – narrowed the scope of Paragraph 15.2.3 such that it thereafter pertained only to the hiring of managers from Little Caesar or its affiliates (and not from other franchisees). In August 2018, Little Caesar agreed with the Attorney General of Washington to begin removing the provision from franchise agreements *in toto*. Notwithstanding these changes, many thousands of franchises still operate under the older provisions and a violation of Paragraph 15.2.3 has at all times remained a basis for franchise termination.

agreements among employers, whether entered into directly or through a third party intermediary, are *per se* illegal under the antitrust laws."[6]  The DOJ/FTC *Guidance* elaborates:

> From an antitrust perspective, firms that compete to hire or retain employees are competitors in the employment marketplace, regardless of whether the firms make the same products or compete to provide the same services.  It is unlawful for competitors to expressly or implicitly agree not to compete with one another, even if they are motivated by a desire to reduce costs.[7]

12.    The no-poach and no-hire agreement between and among Little Caesar franchisees has eliminated franchisees' incentives and ability to compete for management employees and has restricted management employees' mobility.  This agreement has harmed management employees by lowering salaries and benefits employees who otherwise would have commanded in a competitive marketplace, and has deprived employees of better job growth opportunities.

13.    The no-poach and no-hire agreement had and has the purpose of restricting competition for labor and had and has the intended and actual effect of fixing and suppressing manager compensation and restricting manager employment mobility.  The no-poaching agreement between and among Little Caesar franchisees is a naked restraint of trade that is *per se* unlawful under Section 1 of the Sherman

---

[6]    Available at https://www.justice.gov/atr/file/903511/download (last visited August 30, 2018) (Exhibit 3).

[7]    *Id.*

Act, 15 U.S.C. §1.  As the orchestrator of the unlawful agreement, Little Caesar bears *per se* liability therefor.

## THE PARTIES

### *Plaintiff*

14.     Plaintiff Christopher Ogden is a resident of McMinnville, Tennessee. He was employed by McMillan Properties, LLC, a Little Caesar franchisee that owns and operates Little Caesar stores in and near Murfreesboro, Tennessee.  Ogden was employed by McMillan Properties in job titles including crew member, assistant manager and restaurant general manager.

### *Defendants*

15.     Defendant Little Caesar Enterprises, Inc., is a Michigan corporation with its principal place of business at Fox Office Centre, 2211 Woodward Avenue, Detroit, Michigan 48201-3400.  Little Caesar is in the business of selling food to customers primarily through independently owned and operated franchise restaurants.  It has multiple franchise restaurants in every state in the United States.

16.     Defendant LC Trademarks, Inc., is a Michigan corporation with its principal place of business at Fox Office Centre, 2211 Woodward Avenue, Detroit, Michigan 48201-3400.  LC Trademarks, Inc., is a wholly-owned subsidiary of Little Caesar Enterprises, Inc. LC Trademarks, Inc. is the owner of certain proprietary trademarks licensed to Little Caesar Enterprises, Inc. for use by franchisees, and/or

licensed to Little Caesar franchisees. From 2001 through December 2007, LC Trademarks, Inc., offered franchises in California for Little Caesar brand restaurants; it may continue to provide services to existing franchisees located in California.

***Co-Conspirators***

17.    Various other corporations and persons not made defendants in this Complaint, including Little Caesar franchisees, participated as co-conspirators in the violations alleged and performed acts and made statements in furtherance of the violations alleged.

## JURISDICTION AND VENUE

18.    This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff by virtue of Defendant's violations of Section 1 of the Sherman Act, 15 U.S.C. §1 and to enjoin further violations. The Court has subject matter jurisdiction under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, under Section 4 of the Sherman Act, 15 U.S.C. §4, and under 28 U.S.C. §§1331, 1332(d), and 1337 to prevent and restrain the Defendant from violating Section 1 of the Sherman Act, 15 U.S.C. §1.

19.    Venue is proper in this judicial district under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§15, 22, and 26, and under 28 U.S.C. §1391(b)(2),

(c)(2).  Little Caesar has its principal place of business in this district and transacts or has transacted business in this district.  A substantial part of the events that gave rise to this action occurred in this district.

20.    Little Caesar is in the business of selling food to consumers, in part, through independently owned and operated franchise restaurants.  These restaurants are in each state in the United States, and Little Caesar has substantial business activities with each franchised restaurant, including entering into a contractual franchise agreement with the owner of the franchise.  Little Caesar engages in substantial activities at issue in this Complaint that are in the flow of and substantially affect interstate commerce.

## FACTUAL ALLEGATIONS

21.    Little Caesar franchisees compete with each other.  In a properly functioning and lawfully competitive labor market, Little Caesar franchisees would openly compete for labor, including management employees, by soliciting current employees of one or more other franchisees (*i.e.*, attempting to "poach" other franchisees' managers).  A properly functioning labor market would involve "cold calling": the practice by which a prospective employer freely communicates with prospective employees – even if the employee does not first express interest.

22.    For instance, if Franchise A believes that a certain manager performs her job well at Franchise B, then Franchise A would be free to contact that manager

about an employment opportunity.  Conversely, if a manager employed by Franchise B perceives Franchise A to be a better organization – whether because of increased wages, better benefits, or otherwise – then the manager would be free to communicate with Franchise A about potential employment.

23.     Poaching and cold-calling are thus important aspects of a lawfully competitive labor market. Companies perceive other, rival companies' current employees, especially those who are not actively seeking other employment, in a more favorable way.  This is true at least in part because companies value satisfied employees who are good at their jobs, leading them to perceive a rival company's current employees as more qualified, harder working, and more stable than those candidates who are unemployed or who are actively seeking employment.  Thus, a company seeking to hire a new employee will lessen the risks associated with that hire by seeking to hire a rival's employee.  The Little Caesar no-poach agreement inhibits such lateral hiring of current employees because, unless Franchise B grants permission, Franchise A cannot hire Franchise B's current (or recent) manager employee.  Franchise A can only do so once the employee has been separated from Franchise B for more than six months, at which time the employee likely will be viewed by Franchise A as less valuable.  Cold-calling and poaching are thus useful and key competitive tools for companies seeking to recruit employees, particularly employees with unique skills.

24.     No-poaching agreements significantly impact employee compensation. For example, an employee of Franchise B will lack information regarding Franchise A's pay packages unless cold calling and open communications are permitted; without such information, the employee lacks leverage when negotiating with Franchise B.  Similarly, unconstrained by a no-poaching agreement, if an employee of Franchise B receives an offer of higher compensation from Franchise A, the employee can either accept Franchise A's offer or attempt to negotiate a pay increase with Franchise B.  Either way, the employee's compensation increases.

25.     An employee of Franchise B who receives information regarding potential compensation from a rival employer will also likely inform other Franchise B employees.  These Franchise B employees can then also use that information to negotiate pay increases or move to another employer – even if they do not receive a cold call.

26.     Increased mobility combined with increased information and transparency regarding compensation levels tends to increase compensation across all current employees in the labor market.  After all, there is pressure amongst rival employers to match or exceed the highest compensation package offered by rivals in order to gain and retain skilled labor.  Further, the possibility of losing talent to a rival means companies will take steps to reduce the risks of poaching by assuring that employees are not undercompensated.

27.     In a properly functioning and lawfully competitive labor market, Little Caesar franchisees would also openly compete for labor by hiring those qualified manager employees of competing franchises who seek out employment with other franchises.

28.     The beneficial effects of competition (and beneficial effects on compensation) are not, however, limited to those particular individuals who receive cold calls or who wish to speak to a rival company about an employment opportunity.  The effects instead impact all similarly situated employees because of the effect on information flow and on competition for labor.

29.     For all these reasons, the principle of free competition applies to the labor market as well as to trade.  "In terms of suppressing competition, companies agreeing not to compete for each other's employees is the same as companies agreeing not to compete for each other's customers," says Joseph Harrington, Wharton professor of business economics and public policy, in his description of a no-poaching agreement.

30.     According to Peter Cappelli, Wharton management professor and director of Wharton's Center for Human Resources, a no-poaching agreement is unfair to employees and such a pact "benefits the companies at the expense of their employees."  Mr. Cappelli notes that the reason such agreements are illegal and

violate both antitrust and employment laws is because "[c]ompanies could achieve the same results by making it attractive enough for employees not to leave."

31.    The collusion of employers to refrain from hiring each other's employees restricts employee mobility.  This raises employers' power in the market at the expense of employees and diminishes employee bargaining power.  This is especially harmful to management employees of Little Caesar franchise restaurants as those employees are frequently paid below a living wage, and the marketable skills they acquire through their work at Little Caesar restaurants primarily have value only to other Little Caesar restaurants and do not transfer to other fast food restaurants or businesses. [8]  In addition, widespread use of no-poach agreements within the franchise industry at large effectively reduces the number of competitive employers in a market to no more than the number of franchise companies.  No-poach agreements have anti-competitive impact in labor markets analogous to that of mergers in product markets.

32.    Although unemployment in the United States is currently very low, wage growth has been slow.  A decade removed from the Great Recession, wage

---

[8]    In 2014, the average hourly wage of fast food employees was $9.09 or less than $19,000 per year for a full time worker. The poverty level of a family of four in the U.S. is $23,850.  Patrick M. Sheridan, *Low Wage, health activists prepare McDonald's attack,* CNN Money (May 20, 2014) http://money.cnn.com/2014/05/20/news/companies/mcdonalds-meeting (last visited August 30, 2018) (Exhibit 4).

growth has remained stuck below 3 percent.[9]  A growing number of commentators have identified proliferating employer no-poaching agreements – including those used within franchise systems – and dubious employee non-compete agreements as significant contributors to this stagnant wage growth.[10]

33.     The United States DOJ has pursued and resolved civil antitrust investigations relating to no-poach agreements made between or among employers. In 2010, DOJ settlements with six high-tech employers prohibited those companies from engaging in anticompetitive no-solicitation agreements relating to their employees on a going-forward basis.

34.     As noted above, the 2016 DOJ/FTC *Antitrust Guidance for Human Resource Professionals* states:  "Naked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third party intermediary, are per se illegal under the antitrust laws."

35.     On November 21, 2017, United States Senators Cory Booker and Elizabeth Warren wrote to Attorney General Jeff Sessions, asking the AG to respond

---

[9]     *See*      https://www.marketplace.org/2018/02/02/economy/here-truth-about-wages-you-won-t-hear-trump (last visited August 30, 2018) (Exhibit 5).

[10]    *See, e.g.*, Rachel Abrams, *Why Aren't Paychecks Growing? A Burger Joint Clause Offers a Clue*, New York Times (Sept. 27, 2017), https://www.nytimes.com/2017/09/27/business/pay-growth-fast-food-hiring.html (last visited August 30, 2018) (Exhibit 6); Alan B. Krueger and Eric Posner, *Opinion: Corporate America Is Suppressing Wages For Many Workers*, New York Times (Feb. 28, 2018), https://www.nytimes.com/2018/02/28/opinion/corporate-america-suppressing-wages.html (last visited August 30, 2018) (Exhibit 7).

to questions about DOJ's approach to addressing the anti-competitive effects of proliferating no-poach agreements in the franchise context in particular.

36.    In January 2018 and at several speaking events since that time, DOJ antitrust chief and Assistant Attorney General, Makan Delrahim, disclosed that the DOJ Antitrust Division is presently pursuing a number of *criminal* cases relating to employer no-hire agreements.  As noted above, DOJ treats such agreements as, *per se*, unlawful under Section 1 of the Sherman Act.

37.    In April 2018, the DOJ announced that it had resolved an investigation into a no-poach agreement among firms in the rail industry, which – like the other matters discussed above – it labeled as *per se* unlawful.

38.    In July 2018, Attorneys General from 11 states announced an investigation into no-poaching hiring practices at a number of fast food franchise chains, including Little Caesar. According to a release from Illinois Attorney General ("AG") Lisa Madigan, the state is investigating no-poach agreements because those agreements "unfairly stop[] low-income workers from advancing and depress[] their wages."  The state AGs demanded documents and information from franchisors about their no-poach practices.

39.    In July 2018, Washington Attorney General Bob Ferguson announced that in order to avoid lawsuits, seven franchisors had reached agreements to discontinue enforcement of no-poach provisions and to take steps to remove no-

poach language from franchise agreements going forward. Little Caesar was not among these franchisors.

40.     In August 2018, however, Little Caesar also entered into an Assurance of Discontinuation ("AOD") relating to the no-poach and no-hire agreement evidenced in its current franchise agreement. AG Ferguson announced on August 20, 2018, that eight additional restaurant chain franchisors (including Little Caesar) had agreed to discontinue enforcement of no-poach provisions and to take steps to remove no-poach language from franchise agreements going forward. In particular, Little Caesar agreed *inter alia* (i) to not include no-poach provisions in any future franchise agreements in the United States, (ii) to not enforce the provisions in any existing franchise agreements in the United States, (iii) to notify all U.S. franchisees of its agreement with the Washington AG, and (iv) to take steps to remove the provisions from existing agreements with franchisees that have restaurants in Washington.  The AOD specifically notes that Little Caesar "has no obligation to offer its franchisees any consideration – monetary or otherwise – in order to induce them to sign the proposed amendment [removing the provisions], or to take any adverse action against such franchisees if they refuse to do so[.]"

***The Little Caesar System***

41.     Little Caesar opened its first carry-out restaurant in 1959 and offered its first franchises in 1962.  It is the third-largest and (it calls itself) the fastest

growing pizza chain in the United States.  Little Caesar restaurants' primary menu items are pizza, chicken wings, Crazy Bread products and other related items.

42.     At the end of 2016, Little Caesar had more than 4,300 U.S. restaurant locations.  Just under 12% were company-operated; the remaining 88% were owned and operated by franchise businesses.

43.     Little Caesar restaurants generally are carry-out only restaurants.  Little Caesar franchise restaurants can be located in strip shopping centers, shopping malls, free-standing units, and other locations.  Each franchisee is responsible for locating an appropriate restaurant site, which must be approved by Little Caesar.  The franchise is required to operate the restaurant at the specific site that Little Caesar approves, and may not relocate without Little Caesar's approval.

44.     Most of the company's franchises are subject to a standard 10-year franchise license agreement. The initial Little Caesar franchise fee is currently $20,000.

45.     Each franchise is operated as an independently owned and managed business, by an entity that is a separate legal entity from Little Caesar. Little Caesar licenses to franchisees the right to use the Little Caesar brand and system in the operation of these independently owned franchise restaurants.

46.    Like other fast food chains in the industry, Little Caesar restaurants maintain teams of staff in order to oversee operations and guide entry-level employees through daily responsibilities.

47.    Specific job titles falling under the category of "management" may include, among others, assistant manager, shift leader, and general manager.

***Little Caesar Franchisees: Independent Restaurant Owners Competing with One Another***

48.    Each franchise is operated by an entity that is a separate legal entity from Little Caesar. Each franchise is an independently owned and independently managed business.

49.    In executing the Little Caesar franchise agreement, a franchisee specifically acknowledges and represents that it is an independent business person or entity.

50.    A franchisee agrees contractually to identify itself as "an independent franchisee-owner of the Restaurant in conjunction with any use of the [Little Caesar] Proprietary Marks or operation of the restaurant" and to use "written notices to such effect" in a form approved by Defendants.

51.    Franchisees are responsible for day-to-day operations, including employment matters. Each franchisee specifically agrees that it "is solely responsible for all employment decisions of the Restaurant, including, without

limitation, those related to hiring, firing, remuneration, benefits, [and] personnel policies. . . ."

52.     The Little Caesar FDD informs prospective franchisees that they are "responsible for all employment decisions of the Restaurant, including those related to recruiting, hiring, . . .pay, benefits, [and] personnel policies . . . of all workers." The FDD informs prospective franchisees that they must display a "prominent notice" informing employees that the franchisee, and not Little Caesar, is the employer.

53.     The Little Caesar franchise agreement also requires a franchisee "conspicuously" to identify itself to all employees, customers, and others, as an "independent franchisee of Little Caesar," and to place "notice of independent ownership" on all forms and business cards.

54.     Little Caesar and franchisees agree by contract – *i.e.*, in the franchise agreement – that they operate as independent contractors as to each other.  The franchise agreement specifies that nothing therein: "is intended to make either party an agent, legal representative, subsidiary, joint venture, [or] partner . . . of or with the other, for any purpose."

55.     Little Caesar franchise restaurants compete with each other.  In the FDD, Little Caesar tells prospective franchisees that the market for fast food restaurants "is very well developed and very competitive.  You will compete with

other pizza restaurants, as well as other franchised, chain, or independent restaurants serving a wide variety of other foods." Little Caesar notifies franchisees that their costs "will depend on factors such as: how closely you follow our methods and procedures; your management skill, experience, and business acumen; local economic conditions, the local market for our products; the prevailing wage rate; [and] competition. . . ."

56.    The Little Caesar franchise is for a single restaurant at a specified location.    Some Little Caesar franchise agreements allow a one-mile radius "Protected Territory" around the franchise restaurant location.    Little Caesar discloses to prospective franchisees that it may reduce this area to one-half mile or less, or not allow a Protected Territory at all.    It tells franchisees that no Protected Territory is offered within the five boroughs of the City of New York, New York. When a Protected Territory does exist, the FDD informs prospective franchisees that the area may overlap with the protected territories of other franchisees.    Because any protected territory is, in Little Caesar's words, "not exclusive," the FDD also includes the disclaimer "You will not receive an exclusive territory.    You may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control."    The FDD, moreover, confirms that there is no exclusivity with respect to customers located in a protected territory or elsewhere and all restaurants "may solicit and sell products to customers

without regard to the customers' geographic location."  The FDD further informs prospective franchisees that the franchise agreement provides "no options, rights of first refusal, or similar rights to acquire additional franchises" within any protected territory or contiguous area.

57.     In executing the Little Caesar franchise agreement, franchisees agree to these terms, including that the franchise is "non-exclusive" with Little Caesar retaining the right to operate, franchise, or license others to use the Little Caesar marks and system outside any protected area and to do so as well in "non-traditional" settings within the area; franchisees specifically agree by contract that there is no customer exclusivity.

58.     Little Caesar offers franchises for "non-traditional" stores such as its "Classic Express," "Self-Serve Express," and "Cashier Express" locations.  These franchises can share the same geographic territory as traditional stores and compete with traditional stores.

**The Agreement Not to Compete for Management Employees**

59.     Notwithstanding that each franchise is an independently owned and operated business that competes with other franchises, and notwithstanding that each (ostensibly) is responsible for all of its "employment decisions . . . including those related to recruiting, hiring, . . . [and] personnel policies," Little Caesar franchisees have agreed not to compete with each other with respect to manager hiring.  This

agreement is evidenced by and memorialized in explicit contractual terms contained in franchisees' Little Caesar franchise agreements.

60.     In particular, each franchisee who signed a new franchise agreement on a date before March 31, 2017, agreed not to "[e]mploy or seek to employ, directly or indirectly, any person serving in a managerial position who is at the time or was at any time during the prior six months employed by Little Caesar or its affiliates, or a franchisee of any restaurant concept franchised by Little Caesar or its affiliates, without the prior written consent of the then-current or prior employer."[11]

61.     Each franchisee who signed a new franchise agreement on a date beginning no later than 2009 (continuing through 2010 and up to some point before 2015) further expressly agreed that "Violations of the [no-solicit, no-hire] Section shall entitle the prior employer to liquidated damages equal to twice the annual salary of the employee (while employed by the prior employer), plus reimbursement of all costs and attorney fees incurred.  A prior employer shall be deemed to be a third party beneficiary of this Section, with an independent right to bring an action based upon a violation hereof."  That is, each franchisee executing a franchise agreement in that timeframe agreed that every other franchisee was an intended third-party

---

[11]     Effective for franchisees who sign new franchise agreements after March 31, 2017, Defendants changed the restraint so that it restrains the hiring only of persons employed by Little Caesar or its affiliates, and at the level of restaurant general manager or above.

beneficiary of, and had an independent right of action relating to, the provision memorializing the agreement to not poach or hire managers from other franchises.

62.    Franchisee owners must execute a personal guarantee appended to the franchise agreement, pursuant to which they agree to be personally bound by certain of the covenants contained in the franchise agreement.  This specifically includes the no-poach and no-hiring covenants.

63.    As noted, pursuant to the provision memorializing their no-poach agreement, these franchisees also agreed to onerous penalties for any violation of the no-poach pact, beginning with the agreement entitling "the prior employer to liquidated damages equal to twice the annual salary of the employee (while employed with the prior employer), plus reimbursement of all costs and attorney fees incurred."

64.    In addition, in executing the franchise agreement, franchisees contractually agree that any violation of the no-poach, no-hire agreement is an event of "default" and that "Little Caesar may, at its option, terminate this [Franchise] Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately. . . ."

65.    A violation of the no-poach agreement would thus risk the franchisee's entire investment in the business.  Further, though, and aside from both damages payable to a "prior employer" from whom an employee is poached and loss of the

franchise generally, the Little Caesar FDD warns prospective franchisees that a franchise termination for franchisee's default will require the franchisee to pay to Little Caesar liquidated damages.  Each franchisee agrees to this in executing its franchise agreement:  upon termination due to franchisee's default, in addition to immediate payment of all debts owing to Little Caesar or its affiliates, the franchisee must "promptly pay to Little Caesar a lump sum payment" equal to its average monthly royalty and advertising fees multiplied by the lesser of 36 months or the number of months remaining in the then-current term of the franchise agreement.

66.     Franchise termination carries additional risks.  In executing their franchise agreements, franchisees further covenant not, without Little Caesar's prior written consent, to "own . . . operate, . . . be employed by, . . . or have any interest in . . . a business which is a quick or fast service restaurant engaged in the sale of pizza, pasta, sandwiches, chicken wings, and/or related products" within specified geographic areas for a period of 1-2 years.  This applies even if the franchise is terminated early, "regardless of the cause for termination[.]"  Franchisees also specifically agree to reimburse Little Caesar for the costs and expenses of Little Caesar (including, *inter alia*, attorney and expert witness fees, litigation expenses, and travel expenses) that "result" from a failure of the franchisee to comply with the franchise agreement.

67.     Violation of the no-poach agreement thus subjects a franchisee to liquidated damages payable to the prior franchisee-employer, termination of the franchise, up to three years' liquidated damages payable to Little Caesar, and the damage of a covenant to not compete against Little Caesar even after termination.

68.     Effective for franchisees who signed new franchise agreements at some date not later than 2015, Defendants changed the franchise agreement language so that it became silent as to the third-party beneficiary status of other franchisees, the entitlement of other franchisees to liquidated damages for violations of the no-poach agreement, and the independent right of those franchisees to bring an action based on violation of the agreement.

69.     Little Caesar franchises, like other franchises, are made available on standardized terms.   So a franchisee who enters into a Little Caesar franchise agreement knows that the same terms it has agreed to also apply to other franchisees.

70.     One of the standard terms in Little Caesar's franchise agreements with all its franchisees is the no-poach provision referred to above.

71.     Even though for franchises governed by franchise agreements signed after March 31, 2017, Little Caesar changed the no-poach language to preclude the poaching only of persons employed as restaurant general managers (and above) by Little Caesar or its affiliates, there were, as of December 31, 2016, 3,756 franchises

already in existence and operating under older versions of the franchise agreement that contained a broader restraint among franchisees.

72.    Even though for franchises governed by franchise agreements signed beginning on same date in 2015 or earlier (but after 2010), Little Caesar eliminated the specific third-party beneficiary with independent right-of-action language as it related to other franchisees, there were, as of December 31, 2009, 3,320 Little Caesar franchise restaurants already in existence and operating under older versions of the franchise agreement that did contain those provisions.

73.    Even though Little Caesar agreed in August 2018 to begin removing the no-poach language from future franchise agreements altogether, there are thousands of Little Caesar franchise restaurants already in existence and operating under older versions of the franchise agreement that do contain those provisions.

74.    The Little Caesar franchise agreement contains an integration clause. Franchisees specifically contract that, with limited exceptions, franchises are governed by the terms of the franchise agreement a franchisee executes and not by terms later agreed-to by other franchisees.  Little Caesar informs prospective franchisees that the terms of the contract will govern the franchise.

75.    The Little Caesar FDD includes a list of all Little Caesar franchisees, organized by state, city, and street address.  Franchisees thus know that these entities

are the other franchisees as to whom the no-poach agreement memorialized in the franchise agreement applies.

76.    The no-poach and no-hire agreement among Little Caesar franchisees is short-sighted and ultimately not in the franchisees' independent interest, even though it is in the interest of the conspirators as a whole when acting together.

77.    The no-poach and no-hire agreement does not serve the interests of ensuring that Little Caesar restaurants produce a quality product.

78.    The no-poach and no-hire agreement does not serve fast-food customers because it does not incentivize Little Caesar franchisees to invest in training management workers to improve the Little Caesar food, experience, and service.

79.    Consumers can gain from competition among employers because a more competitive workforce may create more or better goods and services.  Further, unemployment is at record lows, yet wage growth has remained sluggish.  Fast-food workers regularly rely on public assistance to supplement their income.  Higher wages would lessen the strain on public assistance, benefiting all consumers.

80.    The no-poach and no-hire agreement is not in the independent interest of Little Caesar franchisees if acting unilaterally.  Management employees are critical to the success of Little Caesar franchises.  A significant component of making the franchise profitable is hiring qualified, motivated, and superior

employees. Therefore, it is in the independent interest of each Little Caesar franchisee to compete for the most talented and experienced restaurant management employees.

81. By adhering to the no-poach and no-hire agreement, franchisees artificially restrict their own ability to hire management employees in a manner that is inconsistent with their own unilateral economic interests. By acting in concert, however, they also protect themselves from having their own management employees poached by other franchises that see additional value in those employees, such as their training, experience and/or work ethic. This allows franchisees to retain their best management employees without having to pay market wages to these management employees or compete in the market place relative to working conditions and promotion opportunities.

82. Most importantly, the no-poach and no-hire agreement does not serve franchisee management employees because it does not incentivize franchisees to invest in higher wages, benefits, and improved working conditions, *i.e.*, to compete for their labor. It also dis-incentivizes employees to perform their best work as those efforts are not rewarded commensurately. Competition among employers helps actual and potential employees through higher wages, better benefits, or other terms of employment.

27

83.   Little Caesar franchisees have a shared interest, however, in keeping labor costs low.  As noted above, franchisees pay to Little Caesar royalties based on a percentage of gross sales. Cost of labor therefore has a direct impact on franchisee profitability.  By agreeing to not compete for management labor, they act against their unilateral self-interest, but serve their shared interest.

84.   But for the no-poach agreement, each Little Caesar franchise is its own economic decision-maker with respect to hiring, firing, staffing, promotions and employee wages.  But for the no-poach agreement, each Little Caesar franchise would compete with each other for the best-performing employees.

### *Other Evidence of Little Caesar's System-Wide Commitment to Suppressing Employee Wages and Mobility and of the Unlawful Agreement*

85.   Low wages are consistent, even if not uniform, across the Little Caesar system.  This has allowed Little Caesar's owners and executives, and Little Caesar franchisees, to become wealthy while full-time, hardworking employees often must resort to government benefits just to put food on their own tables.  A significant reason for this is that Little Caesar has orchestrated an agreement among franchisees to stifle employee wages and mobility.

86.   The average fast-food worker in the United States makes approximately $19,900 per year, while the average fast-food CEO earns $1.2 million per year.

87.   If franchisees had to either pay and promote good management employees, or lose them to competitor locations, they would be forced to pay

competitive wages and provide competitive promotion opportunities. However, because of the no-hire agreement, and because the education, training and experience within the Little Caesar system are unique to Little Caesar and not transferrable to other restaurants, Little Caesar franchisees do not have to compete with other Little Caesar franchisees, and do not have to compete with non-Little Caesar businesses for their management employees except at the entry-level position.

88.    Hart Research Associates surveyed 1,088 fast food workers in 10 major metro areas, and found that 89% of fast food workers have experienced wage-theft, in multiple forms, at their fast food job. Wage theft occurred through forcing employees to work off the clock, not paying workers for all hours worked, denying breaks, and failing to pay for overtime.[12]

89.    From 2007 to 2011, fast food workers in the U.S. drew an average of $7 billion of public assistance annually because of low wages.

90.    Little Caesar is a member of the American Pizza Community (the "APC"), a powerful arm of the food industry lobby specifically speaking for "Big Pizza." The APC coalition was founded in 2010 and includes many of the nation's other largest pizza retailer chains, including Domino's, Papa John's, and Pizza Hut

---

[12]    *See*   http://big.assets.huffingtonpost.com/NationalWageTheftPollMemo.pdf (last visited August 30, 2018) (Exhibit 8).

– each of which, like Little Caesar, is a franchisor.  Among other causes, the APC has been an active critic of the Department of Labor's final ruling on overtime eligibility in 2016.  That ruling doubled the overtime salary threshold from $23,660 to $47,476, guaranteeing overtime pay for millions of additional workers.  The APC previously opposed a minimum wage hike in California and lists labor employment policies as among the top issues on its website.

91.    Little Caesar and its franchisees are well-versed in no-poaching efforts as they regularly employ highly restrictive "non-compete" agreements binding the franchise owners.  Pursuant to the franchise agreement, both during the franchise term, Little Caesar franchisees are contractually prohibited from engaging indirectly or directly in any other business that operates restaurants that sell pizza, pasta, sandwiches, chicken wings, and/or "related products."

92.    Additional evidence also supports the notion that franchisees have agreed not to hire each other's management employees and had means to police that agreement.

93.    Little Caesar form management employee applications include a specific inquiry into whether the candidate has previously been employed at a Little Caesar restaurant.  The application requests information about the dates, location, and supervisor relating to any such employment, as well as whether the store was

corporate-owned or a franchise.  The potential employer can use this information to quickly determine whether the no-hire agreement is implicated for an applicant.

94.    In addition to their shared motivation to enforce the no-hire agreement, and their actual understanding of the no-hire agreement, Little Caesar franchisees also have abundant opportunity to communicate about and coordinate their no-hire agreement.  Little Caesar holds regular or annual franchise business conferences or conventions, at which franchisees have an opportunity to meet and discuss their no-poaching scheme.  Little Caesar franchisees also take part in the Independent Organization of Little Caesars Franchisees ("IOLCF"), which has an Operations Committee that meets quarterly to provide franchisee input into issues such as store-level operations and changes to the Franchise Agreement.  The Operations Committee includes six Little Caesar corporate personnel and six franchisees.

95.    The IOLCF conducts a weekly sales survey, by which members submit sales and cost data.  The survey includes information about franchisee labor costs. This data is compiled and returned to members.

96.    The IOLCF conducts annual conferences in desirable destination locations. Little Caesar itself also conducts regular franchise conventions.

***Employment with Non-Little Caesar Brands Is Not a Reasonable Substitute for Little Caesar Employees***

97.    Training, education, and experience within the Little Caesar system are not transferrable to other restaurants for a number of reasons.

98.    Little Caesar reserves for itself the right to specify or require certain brands or models of communications equipment, computer systems, hardware for back-office and point-of-sale systems, printers and peripherals, backup systems, and the like.

99.    Franchisees are required to utilize the proprietary Caesar Vision system, which Little Caesar describes as an integrated point-of-sale kitchen dashboard, digital menu board, and mobile web system.  Franchisees pay system support fees for this proprietary system and acknowledge that it provides access to confidential and proprietary information.  Experience with these systems is of little value to other brand restaurants.

100.    Franchisees use approved or mandatory suppliers and vendors affiliated with Little Caesar.   Experience with these vendors is of little value to other restaurants.

101.    Franchisees also utilize proprietary store operating procedures, described in Little Caesar's proprietary Operational Resource Guide. Little Caesar notes on its website that "Executing tasks flawlessly is imperative to ensuring our brand's strong reputation and success. We rigorously safeguard our proprietary information and trade secrets."  Franchisees are told that Little Caesar's "simple operating system . . . works and franchisees appreciate the strong foundation we

provide which allows them to focus on what is important to them – growing their business."

102.   A no-poach and no-hire agreement like the agreement among Little Caesar franchisees reduces managers' outside options and lowers their quit rate, thereby increasing the share of net-returns captured by employers.   Further, a franchise-wide no-hire agreement increases the specificity of human capital investment, as training that is productive throughout the franchise chain can be used only by a single franchisee pursuant to the agreement.

## REPRESENTATIVE PLAINTIFF ALLEGATIONS AND ANTITRUST INJURY

103.   Plaintiff Christopher Ogden began working at McMillan Properties, LLC's Little Caesar restaurant in McMinnville, Tennessee in October 2014.   At all relevant times, Ogden was an at-will employee, paid on an hourly basis or at an annual salary rate.

104.   Ogden started as a crew member, at a rate of $7.25 per hour.

105.   In November 2014, Ogden was promoted to assistant manager/shift leader, and his pay increased to a rate of $8.25 per hour.

106.   In July 2015, Ogden was elevated to General Manager of one of McMillan Properties' Murfreesboro, Tennessee Little Caesar stores, with annual salary of $34,000, equating to approximately $13 to $14 per hour.   However, he was

overworked and had no assistant manager.  Ogden requested help or raises, which he was promised.

107.   Because Ogden was unable to transfer to a competing Little Caesar franchise restaurant, his only options were to stay at McMillan Properties' store, or quit and start over at an entry job and wage in another setting.

108.   Ogden quit in October 2016, when McMillan Properties still had not provided assistance or raises.  Ogden took a job making $11.20 per hour at Taco Bell.

109.   The no-poach and no-hire agreement among Little Caesar franchisees suppressed Plaintiff's wages, inhibited his employment mobility, and lessened his professional work opportunities.

### Antitrust Injury

110.   Plaintiff suffered reduced wages, reduced employment benefits, loss of professional growth opportunities, and worsened working conditions because of the express restraint of trade among Little Caesar franchisees, as orchestrated by Little Caesar itself.

111.   Suppressed wages and employment benefits resulting from employers' agreement not to compete with each other in the labor market is injury of the type the antitrust laws were intended to prevent and flows from that which makes the no-poach and no-hire agreement unlawful.

112.    Indeed, the no-poach and no-hire agreement embodies norms that are widely accepted across the fast-food industry and familiar to franchisees.  In advising new restaurant owners on how to hire their first general manager, one industry expert instructs that, "you have to be careful that you do not earn a reputation for stealing other people's employees."

113.   The potential for broader collusion in franchise chains is enhanced when no-poach agreements are in place. Collusion is promoted when the no-poach agreements can be easily generated and monitored amongst a concentrated group of competitors who all stand to gain profits from the collusion while maintaining similar costs.

114.   The Little Caesar franchisees' no-hire agreement significantly restricts employment opportunities for low-wage workers at all Little Caesar restaurants, including those who have not sought employment with a competitor franchise and those who have not been contacted by a competitor franchise.  Such a restriction causes a wider effect upon all Little Caesar restaurant employees.

115.   Plaintiff was a victim of the no-poach and no-hire agreement.  By adhering to that agreement, otherwise independently owned and operated competitor businesses suppressed wages and stifled labor market competition for improved employment opportunities.

## **CLASS ALLEGATIONS**

116.   Plaintiff brings this action on behalf of himself, and on behalf of a nationwide class pursuant to Federal Rules of Civil Procedure, Rules 23(a), 23(b)(2), and/or 23(b)(3).

> All persons in the United States who are current or former managers at all franchisee-operated Little Caesar restaurants.

117.   Excluded from the Class are Defendants, their affiliates, officers and directors, and the Court.   Plaintiff reserves the right to modify, change, or expand the Class definition on discovery and further investigation.

118.   Numerosity:  Upon information and belief, the Class is so numerous that joinder of all members is impractical; there are thousands of Little Caesar restaurants in the U.S. While the exact number and identities of the individual Members of the Class are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis alleges, that thousands of Class Members are the subjects of the Class.

119.   Existence and Predominance of Common Questions of Fact and Law: Common questions of fact and law exist as to all Members of the Class.  These questions predominate over the questions affecting individual Class Members. These common legal and factual questions include, but are not limited to, whether:

   a.  Defendants engaged in unlawful contracts, combinations, and/or conspiracies in restraint of trade and commerce;

   b.  Defendants violated the Sherman Antitrust Act, 15 U.S.C. §§1, *et seq.*;

   c.  Defendants should be required to disclose the existence of such agreements, contracts, combinations, and/or conspiracies;

   d.  Plaintiff and Class Members are entitled to damages, restitution, disgorgement, equitable relief, and/or other relief; and

   e.  The amount and nature of such relief to be awarded to Plaintiffs and the Class.

120. Typicality: All of Plaintiff's claims are typical of the claims of the Class inasmuch as Plaintiff was a Little Caesar franchisee restaurant manager and each Member of the Class either was or is a Little Caesar franchisee restaurant manager subject to the same agreements and rules as Plaintiff. Further, Plaintiff and all the Members of the Class sustained the same monetary and economic injuries of being subjected to artificial suppression of compensation, wages, benefits, and growth opportunity, and the remedy sought for each is the same in which Plaintiff seeks relief against Defendants for himself and all Class Members.

121. Adequacy: Plaintiff is an adequate representative because his interests do not conflict with the interest of the Class that they seek to represent, he has

retained counsel competent and highly experienced in complex class action litigation, and he intends to prosecute this action vigorously.  The interest of the Class will be fairly and adequately protected by Plaintiff and his counsel.

122.   Superiority:  A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and members of the Classes. The injuries suffered by each individual Class Member are relatively small in comparison to the burden and expense of the individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct.  It would be virtually impossible for members of the Classes individually to redress effectively the wrongs done to them.  Even if the Members of the Classes could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments.  Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court.   Upon information and belief, Members of the Class can be readily identified and notified based on, *inter alia*, Defendants' employment records and franchisees' records.

123.   Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## FRAUDULENT CONCEALMENT

124.   Plaintiff and Class Members had neither actual nor constructive knowledge of the unlawful no-poach and no-hiring conspiracy orchestrated by Defendants, nor would any reasonable amount of diligence by Plaintiff or the Class have put them on notice of the conspiracy.  Any statute of limitations is therefore tolled by Defendants' intentional concealment of their no-poach and no-hire agreement.  Plaintiff and Class members were deceived regarding Defendants' collusion to suppress wages and employment mobility and could not reasonably discover the Defendants' anticompetitive conduct.

125.   Neither Defendants nor franchisees disclosed the existence of the no-poach and no-hire conspiracy to Plaintiff or Class Members.

126.   Little Caesar's public statements conceal the fact that it orchestrated and engaged in a no-poach and no-hire conspiracy among franchisees.

127.   Little Caesar tells employees and prospective employees that its work culture is to "treat each other as family."  It informs employees that "We work together to deliver results that cannot be delivered alone.  We are friends and teammates who respect, support, honor and encourage one another.  Everyone's

voice at the table matters."  Little Caesar tells employees that it operates a "fun and welcoming environment," where "[w]e hit our goals and take time to recognize and celebrate individual and team successes."

128.   Little Caesar tells prospective employees that its "success as a big-town name is because of our focus on small town values."  Little Caesar asserts that those values include "own[ing] your work."  "We give more than what's expected.  We embrace accountability and care deeply.  We have relentlessly high standards and never accept less than the best."  These statements conceal the fact that Little Caesar and its franchisees have in fact colluded to suppress the wages of franchise store management personnel.

129.   The "store jobs" hiring section of Little Caesar's website directs prospective employees to the particular openings available at specific franchise and store locations in the geographic area selected by a prospective employee.  Little Caesar's website also informs visitors submitting comments that "If your comments relate to employment issues at a Little Caesars location that is independently owned and operated by a Little Caesars franchisee, please be advised that your concern will be forwarded automatically to the owner of this restaurant.  As an independent owner, and pursuant to our contractual relationship, the franchisee is solely responsible for all employment matters."  These statements highlight the supposed

independence of franchisee-employers and conceal the existence of the collusive no-poach agreement.

130.   As alleged above, each franchisee also informs all employees that it "is solely responsible for all employment decisions of the Restaurant, including, without limitation, those related to hiring, firing, remuneration, benefits, [and] personnel policies. . . ." Franchisees display "prominent notice" informing employees that the franchisee, and not Little Caesar, is the employer.  Franchisees "conspicuously" identify themselves to all employees, customers, and others, as an "independent franchisee of Little Caesar," and place "notice of independent ownership" on all forms and business cards.  These actions also conceal the existence of the collusive no-poach agreement.

131.   Plaintiff and the Class would thus have no reason to know of the no-poach and no-hire agreements evidenced by franchisees' contractual undertakings with Defendants.  Plaintiff and the Class are not parties to franchisees' contractual franchise agreements with Defendants. Nor are these contracts routinely provided to Plaintiff.

132.   Although Defendants provided their form franchise documents to state regulators, franchise disclosure documents and form franchise agreements are made available by Defendants only upon request by prospective franchisees.  Obtaining

Defendants' historic franchise disclosure documents and form franchise agreements is even more difficult.

133.   In order to obtain Defendants' current franchise disclosure documents and form franchise agreement from Little Caesar, a prospective franchisee must submit an application (with supporting documents) seeking to open a franchise. Only after Little Caesar reviews the application to ensure that the franchisee meets initial qualifications does Little Caesar provide the franchise disclosure document. Prospective franchisees are told that in order to qualify for consideration, they should have a minimum of $100,000 in liquid assets, a net worth of $250,000 or greater, and have the ability to obtain financing to cover the cost of opening a location.

134.   Defendants' franchise disclosure documents and form franchise agreements are not routinely provided to employees (or prospective employees) of franchisees, whether by Defendants, by franchisee employers, by regulators, or by anyone else.   Historic franchise disclosure documents and form franchise agreements would never be available to franchisee employees or prospective employees.

135.   Even upon entering into the Assurance of Discontinuation with the Attorney General of Washington relating to the current no-poach and no-hire agreement evidenced in Little Caesar's franchise agreement, Little Caesar purported to deny that it was in violation of Washington state law or any other law, and further

purported to deny that the no-poach and no-hire agreement "had any adverse effect on competition in the industry or on the wages earned by its own or its franchisees' employees."

136.   Because of Defendants' successful deceptions and other concealment efforts described herein, Plaintiff and Class Members had no reason to know Defendants had conspired to suppress compensation or employee mobility.

137.   As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to the claims that Plaintiff and the Class Members have as a result of the anticompetitive and unlawful conduct alleged herein.

## **CLAIM FOR RELIEF**

### **COUNT I: VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. §1,** *et seq***.**

138.   Plaintiff, on behalf of himself and all others similarly situated, re-alleges and incorporates by reference the allegations contained in the preceding and succeeding paragraphs of this Complaint, and further alleges against Defendants as follows:

139.   Beginning no later than 2009, Defendants orchestrated, entered into, and engaged in unlawful contracts, combinations in the form of trust or otherwise, and/or conspiracies in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. §1, *et seq*.

140.   Defendants engaged in predatory and anticompetitive behavior by orchestrating an agreement to restrict competition among Little Caesar franchisees, which unfairly suppressed management employee wages, and unreasonably restrained trade.

141.   Defendants' conduct included concerted efforts, actions and undertakings among the Defendants and franchise owners with the intent, purpose, and effect of: (a) artificially suppressing the compensation of Plaintiff and Class Members; (b) eliminating competition among franchise owners for skilled labor; and (c) restraining management employees' ability to secure better compensation, advancement, benefits, and working conditions.

142.   Defendants perpetrated the scheme with the specific intent of lowering costs to the benefit of Defendants and franchise owners.

143.   Defendants' conduct in furtherance of the no-poach and no-hire agreement were authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of Defendants' affairs.

144.   Plaintiff and Class Members have received lower compensation from Little Caesar franchise businesses than they otherwise would have received in the absence of Defendants' unlawful conduct and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

145. Defendants' contracts, combinations, and/or conspiracies are *per se* violations of Section 1 of the Sherman Act.

146. In the alternative, Defendants are liable under a "quick look" analysis where an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on employees and labor.

147. Defendants' contracts, combinations, and/or conspiracies have had a substantial effect on interstate commerce.

148. As a direct and proximate result of Defendants' contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

149. Plaintiff and the Class Members are entitled to treble damages, attorneys' fees, reasonable expenses, costs of suit, and, pursuant to 15 U.S.C. §26, injunctive relief, for the violations of the Sherman Act and the threatened continuing violations alleged herein.

## <u>PRAYER FOR RELIEF</u>

Wherefore, Plaintiff, on behalf of himself and Members of the Class, requests that this Court:

A.     Determine that the claims alleged herein may be maintained as a Class Action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

B.     Appoint Plaintiff as the representative of the Class and his counsel as Class Counsel;

C.     Declare that Defendants' actions as set forth in this Complaint violate the law;

D.     Award Plaintiff and the Class damages in an amount according to proof against Defendants for Defendants' violations of 15 U.S.C. §1, to be trebled in accordance with those laws;

E.     Award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiff and the Class Members are entitled;

F.     Grant a permanent injunction enjoining Defendant from enforcing or adhering to any existing agreement that unreasonably restricts competition as described herein;

G.     Declare Defendants be permanently enjoined and restrained from establishing any similar agreement unreasonably restricting competition for management employees except as prescribed by this Court;

H.    Declare Defendants to be financially responsible for the costs and expenses of a Court-approved notice program by mail, broadcast media, and publication designed to give immediate notification to Class Members;

I.    Award pre-judgment and post-judgment interest on such monetary relief;

J.    Award reasonable attorneys' fees and costs; and

K.    Grant such further relief that this Court deems appropriate.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all issues so triable.

Dated:  September 7, 2018         **THE MILLER LAW FIRM, P.C.**

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
Dennis A. Lienhardt (P81118)
950 W. University Dr., Suite 300
Rochester, MI  48307
Tel: 248-841-2200
epm@millerlawpc.com
ssa@millerlawpc.com
dal@millerlawpc.com

Derek Y. Brandt
**McCUNE WRIGHT AREVALO, LLP**
100 North Main Street, Suite 11
Edwardsville, Illinois 62025
Tel: 618-307-6116
dyb@mccunewright.com

Richard D. McCune
Michele M. Vercoski
**McCUNE WRIGHT AREVALO, LLP**
3281 East Guasti Road, Suite 100
Ontario, California 91761
Tel: 909-557-1250
rdm@mccunewright.com
mmv@mccunewright.com

Walter W. Noss
Stephanie A. Hackett
Sean C. Russell
**SCOTT + SCOTT ATTORNEYS AT
LAW LLP**
600 West Broadway, Suite 3300
San Diego, California 92101
Tel: 619-233-4565
wnoss@scott-scott.com
shackett@scott-scott.com
sean.russell@scott-scott.com

*Counsel for Plaintiff and the Class*