UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTOPHER OGDEN,

            Plaintiff,                            Case Number 18-12792

v.                                                 Honorable David M. Lawson

LITTLE CAESAR ENTERPRISES, INC.
and LC TRADEMARKS, INC.,

            Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DISMISSING COMPLAINT WITH PREJUDICE

Plaintiff Christopher Ogden has sued Little Caesar Enterprises, alleging that the pizza maker violated the Sherman Act by requiring its franchisees to adhere to a "no poaching" provision in its franchise agreement, which has the effect of stifling competitive wages and mobility of their restaurant managers, including Ogden. That provision prevents one franchisee from hiring the management employee of another franchisee without permission. The defendants, Little Caesar Enterprises, Inc. (LCE) and LC Trademarks, Inc., have moved to dismiss the complaint, arguing that it does not state a viable antitrust claim. The plaintiff has not made a serious effort to state a case under a rule-of-reason antitrust theory. And the plaintiff has not pleaded sufficient facts to show that his case fits within the narrow set of cases to which the Supreme Court has applied the *per se* analysis, and even under the hybrid "quick look" approach the complaint fails to state a claim. Finally, he had not advanced sufficient facts to establish that he has suffered any cognizable "anti-trust injury" as a result of the alleged no poaching agreement. Therefore, the Court will grant the defendants' motion and dismiss the complaint.

A.

Because this is a motion to dismiss, all of the following facts are stated as alleged in the plaintiff's complaint.

Defendants LCE and LC Trademarks, Inc. are the principal corporate constituents of the nationally popular Little Caesar chain of pizza restaurants, which operates more than 4,300 locations in the United States. Of those, approximately 12% are company stores, that is, they are owned directly by the corporate entity, while the other 88% are independent franchises that are licensed to operate under a comprehensive franchise agreement between the local franchise owner and the corporate parents. Franchisees must pay an up-front fee of $20,000 upon submission of their application, and they also must locate a suitable store front approved by LCE. The franchise agreements typically have a term of 10 years, and each franchisee must operate solely from the site approved by LCE. Depending on the geographic market, a franchisee may be assured that it will have a limited radius of "exclusive territory" in which other LC franchisees will not be permitted to operate; but the exclusive territory may be diminished or even eliminated at the sole discretion of LCE.

Ogden alleges that "beginning no later than 2009, Little Caesar franchisees contracted, combined, and/or conspired to not solicit, poach, or hire each other's management employees." Compl. ¶ 7. He says that this conspiracy "was evidenced by franchisees' written pledge in Paragraph 15.2.3 of their franchise agreements to not: 'Employ or seek to employ, directly or indirectly, any person serving in a managerial position who is at the time or was at any time during the prior six (6) months employed by Little Caesar or its affiliates, or a franchisee of any restaurant concept franchised by Little Caesar or its affiliates, without the prior written consent of the then-current or prior employer.'" *Ibid.* This agreement was in effect across the company up to March

21, 2107, binding every franchisee. And the version in effect before sometime in 2010 contained a liquidated damages provision favoring the prior employer if a franchisee hired a management employee away. Violating the "no poaching" provision was a ground for terminating the franchise agreement, which carried with it severe economic consequences.

Apparently as a measure to effectuate the no-poaching clause, LCE's management employee application forms included a block for the applicant to disclose previous employment with an LCE store, along with the dates, location, and supervisors, and whether the location was a company store.

The plaintiff alleges that the "no-poach agreement inhibit[ed] . . . lateral hiring of current employees because, unless Franchise B grants permission, Franchise A cannot hire Franchise B's current (or recent) manager employee." Compl. ¶ 23. The complaint incorporates extensive background material from published news accounts and scholarship tending to suggest generally that "no-poach" or "non-compete" agreements have had a widespread impact in reducing the mobility and wages of low paid workers in the fast-food industry. Ogden also alleges in the complaint that, in August 2018, after Little Caesar and other franchisors were sued by the Attorney General of the State of Washington, Little Caesar "entered into an 'Assurance of Discontinuation' agreement with the Washington AG, under which it agreed '(i) to not include no-poach provisions in any future franchise agreements in the United States, (ii) to not enforce the provisions in any existing franchise agreements in the United States, (iii) to notify all U.S. franchisees of its agreement with the Washington AG, and (iv) to take steps to remove the provisions from existing agreements with franchisees that have restaurants in Washington.'" Compl. ¶ 40.

The complaint included allegations directed to certification of a putative class of all Little Caesar management employees. However, presently the claims pleaded are advanced by only a

single named plaintiff, Christopher Ogden. Ogden resides in McMinnville, Tennessee. He was employed by McMillan Properties, LLC, a Little Caesar franchisee that owns and operates Little Caesar stores in the vicinity of Murfreesboro, Tennessee. Ogden began his employment with the McMillan franchise as a crew member, then became an assistant manager, and then a restaurant general manager. He was first hired in October 2014 as a crew member, at a rate of $7.25 per hour, but in November 2015 he was promoted to the position of assistant manager and shift leader, and his pay was increased to a rate of $8.25 per hour. In July 2015, Ogden was promoted to General Manager of one of McMillan's Murfreesboro, Tennessee Little Caesar stores, with an annual salary of $34,000 (approximately $16 to $17 per hour). Ogden contends, however, that he was "overworked and had no assistant manager," and that he requested additional staff or a raise. Compl. ¶ 106. Ogden eventually became frustrated with the lack of support and poor compensation, but "[b]ecause [he] was unable to transfer to a competing Little Caesar franchise restaurant, his only options were to stay at McMillan Properties' store, or quit and start over at an entry [level] job and wage in another setting." Compl. ¶ 107. "Ogden quit in October 2016, when McMillan Properties still had not provided [any] assistance or raises," and he subsequently "took a job making $11.20 per hour at Taco Bell." Compl. ¶ 108.

Ogden asserts, based on those above facts, that "[t]he no-poach and no-hire agreement among Little Caesar franchisees suppressed [his] wages, inhibited his employment mobility, and lessened his professional work opportunities." Compl. ¶ 109. He also contends that "[t]he Little Caesar franchisees' no-hire agreement significantly restricts employment opportunities for low-wage workers at all Little Caesar restaurants, including those who have not sought employment with a competitor franchise and those who have not been contacted by a competitor franchise." Compl. ¶ 114. Ogden also alleges that he "was a victim of the no-poach and no-hire agreement,"

because "[b]y adhering to that agreement, otherwise independently owned and operated competitor businesses suppressed wages and stifled labor market competition for improved employment opportunities." Compl. ¶ 115. However, Ogden asserts that neither he nor any other members of the putative class of Little Caesar managers "had . . . actual [or] constructive knowledge of the unlawful no-poach and no-hiring conspiracy orchestrated by Defendants, nor would any reasonable amount of diligence by Plaintiff . . . have put [him] on notice of the conspiracy," because "[n]either Defendants nor [any of their] franchisees disclosed the existence of the no-poach and no-hire conspiracy to Plaintiff." Compl. ¶¶ 124-25.

In a single count under the Sherman Act, 15 U.S.C. § 1, the plaintiff alleges that the defendants "engaged in predatory and anticompetitive behavior by orchestrating an agreement to restrict competition among Little Caesar franchisees, which unfairly suppressed management employee wages, and unreasonably restrained trade." Compl. ¶ 140. According to the plaintiff, the "Defendants' conduct included concerted efforts, actions and undertakings among the Defendants and franchise owners with the intent, purpose, and effect of: (a) artificially suppressing the compensation of Plaintiff and Class Members; (b) eliminating competition among franchise owners for skilled labor; and (c) restraining management employees' ability to secure better compensation, advancement, benefits, and working conditions." Compl. ¶ 141. Ogden alleges that the "Defendants' contracts, combinations, and/or conspiracies are *per se* violations of Section 1 of the Sherman Act," Compl. ¶ 145, or that "[i]n the alternative, [the] Defendants are liable under a 'quick look' analysis [because] an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on employees and labor," *id.* ¶ 146.

On September 7, 2018, the plaintiff filed his complaint pleading a single claim under the Sherman Act, 15 U.S.C. § 1, alleging that the "no-poaching" clause in the franchise agreement was an illegal restraint of trade under either the "*per se*" or "quick look" rules of decision applicable to "horizontal" agreements by potential competitors to refrain from competition. The defendants responded with their motion to dismiss.

II.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). A "claim is facially plausible when a plaintiff 'pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Matthew N. Fulton, DDS, P.C. v. Enclarity, Inc.*, 907 F.3d 948, 951-52 (6th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). When reviewing the motion, the Court "must 'construe the complaint in the light most favorable to the plaintiff[] [and] accept all well-pleaded factual allegations as true.'" *Id.* at 951 (quoting *Hill v. Snyder*, 878 F.3d 193, 203 (6th Cir. 2017)).

"Section 1 of the Sherman Act prohibits '[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States.'" *Ohio v. American Express Co.*, --- U.S. ---, 138 S. Ct. 2274, 2283 (2018) (quoting 15 U.S.C. § 1). The Supreme Court, however, "has long recognized that, '[i]n view of the common law and the law in this country' when the Sherman Act was passed, the phrase 'restraint of trade' is best read to mean '*undue* restraint.'" *Ibid.* (quoting *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 59-60 (1911)). The "Court's precedents have thus understood § 1 'to outlaw only *unreasonable* restraints.'" *Ibid.* (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)). "For a plaintiff to

successfully bring an antitrust claim under Section 1 of the Sherman Act, the plaintiff must establish that the defendant's actions constituted an unreasonable restraint of trade which caused the plaintiff to experience an antitrust injury." *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 269 (6th Cir. 2014).

"Restraints can be unreasonable in one of two ways"; in the first category, "[a] small group of restraints are unreasonable *per se* because they always or almost always tend to restrict competition and decrease output." *Ohio v. American Express*, 138 S. Ct. at 2283 (quotations and alterations omitted in this and following citations). "Typically only 'horizontal' restraints — restraints imposed by agreement between competitors — qualify as unreasonable *per se*." *Id.* at 2283-84. "Restraints that are not unreasonable *per se* are judged under the 'rule of reason,'" which "requires courts to conduct a fact-specific assessment of market power and market structure to assess the restraint's actual effect on competition." *Id.* at 2284. Under that rubric, "[t]he goal is to distinguish between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Ibid.* "[V]ertical restraints — i.e., restraints imposed by agreement between firms at different levels of distribution [nearly always] should be assessed under the rule of reason." *Ibid.* "Vertical restraints often pose no risk to competition unless the entity imposing them has market power, which cannot be evaluated unless the Court first defines the relevant market." *Id.* at 2285 n.7. The Court "usually cannot properly apply the rule of reason [to the analysis of a vertical restraint] without an accurate definition of the relevant market," because "[w]ithout a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition." *Id.* at 2285.

The Sixth Circuit has recognized the application of a third approach known as the "quick look," which it denotes as a special case of a rule-of-reason analysis in which the requirements for

definition of the relevant market are relaxed. *Se. Milk Antitrust*, 739 F.3d at 274 ("This Court has characterized 'quick look' analysis as a third type of category arising from the blurring of the line between *per se* and rule of reason cases."). "This less-rigid approach aligns with the Supreme Court's recognition of the value of the 'quick look' approach as an abbreviated form of the rule of reason analysis used for situations in which 'an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and market.'" *Ibid.* (quoting *California Dental Association v. FTC*, 526 U.S. 756, 770 (1999)). In the *California Dental Association* case, the Supreme Court explained that "no elaborate industry analysis is required to demonstrate the anticompetitive character of horizontal agreements among competitors to refuse to discuss prices, or to withhold a particular desired service." 526 U.S. at 770 (citations omitted). The Court noted that the exemplar cases that had inspired the quick look approach involved explicitly restrictive agreements such as (1) a national sports league's television plan that "expressly limited output (the number of games that could be televised) and fixed a minimum price," (2) an "absolute ban on competitive bidding," and (3) "a horizontal agreement among the participating dentists to withhold from their customers a particular service that they desire." *Ibid.* (collecting cases).

A.

The defendants argue that the plaintiff has not pleaded facts that would justify application of the *per se* approach, and even the "quick look" method is inappropriate here. The plaintiff counters by citing several cases for the proposition that courts typically defer the commitment to a rule of decision until after discovery has produced a sufficient record for the typically fact-bound inquiry into the market effects of the defendants' conduct. However, the plaintiff pointedly resists the defendants' insistence that the claims can and should be subjected to the default and most

commonly applied "rule of reason" analysis which is favored by the federal courts in nearly all anti-trust cases. Thus, the plaintiff himself has tethered the viability of his pleading to the application of either the *per se* or "quick look" rules of decision, which are more amenable to analysis at the pleading stage. He has not even attempted to advance allegations or arguments supporting any claim under the rule-of-reason standard.

That may make sense for a tactical reason, as the plaintiff seeks to certify this case as a class action and represent a putative nationwide class. Attempting to define the relevant market for fast-food employees generally — and Little Caesar employees in particular — could be problematic. As one court explained:

> As defendants have pointed out, plaintiff has not attempted to plead a claim under the rule of reason. This is perhaps unsurprising. To state a claim under the rule of reason, a plaintiff must allege market power in a relevant market. The relevant market for employees to do the type of work alleged in this case is likely to cover a relatively-small geographic area. Most employees who hold low-skill retail or restaurant jobs are looking for a position in the geographic area in which they already live and work, not a position requiring a long commute or a move. That is not to say that people do not move for other reasons and then attempt to find a low-skill job; the point is merely that most people do not search long distances for a low-skill job with the idea of then moving closer to the job. Plaintiff, though, seeks to represent a nationwide class, and allegations of a large number of geographically-small relevant markets might cut against class certification

*Deslandes v. McDonald's USA, LLC*, No. 17-4857, 2018 WL 3105955, at *8 (N.D. Ill. June 25, 2018).

Regardless of his rationale, the plaintiff's avoidance of the rule-of-reason theory cuts against his reliance on authorities that counsel against addressing dispositive motions until some discovery has taken place.

## B.

The defendants argue that the agreement in this case, between franchisor and franchisee, is a "vertical agreement" that only restricts "intrabrand" competition, which has the effect of actually

promoting "interbrand" competition by restraining franchisees under the same brand from harming each other. Such agreements, the defendants contend, must be evaluated under the rule-of-reason, not the *per se*, approach. And they insist that the allegations here do not measure up under that theory because they fail to allege any substantial facts to establish that any franchisees entered into actual horizontal agreements, and the mere allegations of horizontal effects of the franchise agreement are not sufficient to establish a plausible anti-trust claim per *Twombly*.

The plaintiff responds that the coordinated establishment of vertical agreements that orchestrate restraints of competition between horizontal competitors has been regarded as a "horizontal agreement" where the scheme is directed by a single controlling upstream entity in a "hub and spoke" pattern. They assert that contrary to the defendants' naked assertions that Little Caesar's franchisees do not compete with each other, the franchise paperwork contains numerous caveats informing franchisees that they are not guaranteed exclusive territories and may compete with other franchisees, or any exclusive territory may be narrowed or eliminated at the discretion of the defendants. And they contend that it is well-settled that agreements to fix prices or wages among horizontal competitors are *per se* illegal under the Sherman Act.

The Sixth Circuit has explained that, regardless of the alignment of the parties to an agreement, the *per se* "doctrine . . . applies 'only if a restraint clearly and unquestionably falls within one of the handful of categories that have been collectively deemed *per se* anticompetitive.'" *Innovation Ventures, LLC v. Custom Nutrition Labs., LLC*, 912 F.3d 316, 340-41 (6th Cir. 2018) (quoting *Se. Milk Antitrust*, 739 F.3d at 273). "'The classic examples are naked, horizontal restraints pertaining to prices or territories.'" *Id.* at 341 (quoting *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 907 (6th Cir. 2003)).

The plaintiff has not established that his claims properly could be allowed to proceed under a *per se* analysis, because the complaint does not anywhere allege that the defendants, or their franchisees, engaged in any explicit agreement either to fix wages or to divide the labor market into any discernible exclusive territories. Those are the only two narrow categories of agreements to which the Sixth Circuit has applied that strict rule of decision.

The Sixth Circuit has explained that the *per se* doctrine should be applied "reluctantly and infrequently, informed by other courts' review of the same type of restraint, and only when the rule of reason would likely justify the same result," and it has observed with "caution[] that the Supreme Court has described the *per se* rule as a 'demanding' rule that should be applied 'only in clear cut cases'" *Se. Milk Antitrust Litig.*, 739 F.3d at 271 (quoting *National Hockey League Players' Association v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 718 (6th Cir. 2003) (citing *Continental TV, Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977); *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172 (1965))). "Indeed, the Sixth Circuit has an automatic presumption in favor of the rule of reason standard, while the *per se* rule is reserved only for those infrequent occasions of clear cut cases in which the trade restraint is so unreasonably anticompetitive that they present straightforward questions for reviewing courts." *Id.* at 273 (quotations and citations omitted).

In this case, the plaintiff has not explained how his claims fit into the narrow categories delineated by the Sixth Circuit for application of the *per se* rule, nor has he cited any decision holding that the sort of agreement pleaded here properly can be subjected to that mode of analysis. *Innovation Ventures*, 912 F.3d 316, 341 (6th Cir. 2018) ("These restrictive covenants do not fix prices or allocate territory, and Defendants have not made any other argument to explain why they necessarily fit into any other category of *per se* violation. Because the restrictive covenants do not

clearly and unquestionably fall within the delineated categories of *per se* impermissible restraints, application of a *per se* rule is not appropriate." (quotations and citations omitted)).

The plaintiff correctly points out that there is some authority for the proposition that the agreements here are not strictly "vertical," because, although nominally executed between only the corporate parent and an individual franchisee, the agreements explicitly allowed for enforcement of the no-poaching clause by any non-party franchisee by civil suit, and they threatened that violating the provision to the detriment of a non-party franchisee could lead to sanctions from the corporate parent including termination of the franchise. Moreover, the pertinent market here does not concern service of pizza to the hungry public, in which the franchisees may not compete, but the market for hiring of employees by fast-food restaurants, in which they certainly do. *See Deslandes*, 2018 WL 3105955, at *8 ("This case . . . is not about competition for the sale of hamburgers to consumers. It is about competition for employees, and, in the market for employees, the McDonald's franchisees and McOpCos within a locale are direct, horizontal, competitors."). Thus, the defendants' insistence that the agreements are purely "vertical" is not well taken.

But even if the agreements are viewed as between "horizontal" competitors, that does not settle the question of which mode of analysis must apply. "[H]orizontality alone does not necessarily justify invocation of the *per se* rule," because "'applying the rule of reason is the default position and can be applied to horizontal restraints as well if they do not fit into existing categories of *per se* violations.'" *Innovation Ventures*, 912 F.3d at 341 (quoting *Se. Milk Antitrust*, 739 F.3d at 273). In this case, regardless of the alignment of the agreements, the *per se* analysis is not warranted; even the cases cited by the plaintiff as the leading decisions in support of his position have declined plaintiffs' invitations to apply a *per se* analysis to franchise agreements of

the sort alleged here. *E.g.*, *Deslandes*, 2018 WL 3105955, at *7 ("Because the restraint alleged in plaintiff's complaint is ancillary to an agreement with a procompetitive effect, the restraint alleged in plaintiff's complaint cannot be deemed unlawful *per se*."); *Butler v. Jimmy John's Franchise, LLC*, 331 F. Supp. 3d 786, 797 (S.D. Ill. 2018) (declining to decide the question of what rule of decision should apply, but observing that the franchise agreements likely could not be subjected to *per se* analysis).

Moreover, as the Supreme Court has observed, the analysis of any agreement having some vertical component is complex and not amenable to a *per se* approach. "The market impact of vertical restrictions is complex because of their potential for a simultaneous reduction of intrabrand competition and stimulation of interbrand competition." *Continental TV, Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 51 (1977). "Vertical restrictions promote interbrand competition by allowing the [upstream entity] to achieve certain efficiencies in the distribution of [its] products. These 'redeeming virtues' are implicit in every decision sustaining vertical restrictions under the rule of reason. Economists have identified a number of ways in which [producers] can use such restrictions to compete more effectively against other [producers]." *Id.* at 54-55. "When anticompetitive effects are shown to result from particular vertical restrictions they can be adequately policed under the rule of reason, the standard traditionally applied for the majority of anticompetitive practices challenged under s 1 of the Act." *Id.* at 59; *see also California Dental Association*, 526 U.S. at 775 ("[T]he [dentist association's] rule appears to reflect the prediction that any costs to competition associated with the elimination of across-the-board advertising will be outweighed by gains to consumer information (and hence competition) created by discount advertising that is exact, accurate, and more easily verifiable (at least by regulators). As a matter of economics this view may or may not be correct, but it is not implausible, and neither a court nor

the Commission may initially dismiss it as presumptively wrong."). Those concerns weigh in favor of the application of a rule of reason here, where the no-poaching clause explicitly prohibits only intrabrand hiring, and even then does not entirely forbid cross-hiring, but merely requires consent from the franchisee that an employee wants to depart before completion of a contemplated transfer to another same-branded store.

The plaintiff's invocation of statutory and regulatory guidance by the Department of Justice offers little support for his position, since that guidance has been held to be inapplicable to the sort of agreement at issue here, which does not qualify for the heightened scrutiny afforded to a "naked" no-poaching compact between unaffiliated entities. As the district court explained in *Kelsey K. v. NFL Enterprises LLC*, No. 17-496, 2017 WL 3115169 (N.D. Cal. July 21, 2017), *aff'd*, No. 17-16508, 2018 WL 6721730 (9th Cir. Dec. 21, 2018):

> Plaintiff also cites an "Antitrust Guidance for Human Resource Professionals" from the United States Department of Justice for the proposition that Article 9.1(C)(11) is a *per se* illegal "no poaching" agreement under antitrust laws. The cited part of the DOJ Guidance states:
>
>> Naked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are *per se* illegal under the antitrust laws. That means that if the agreement is separate from or not reasonably necessary to a larger legitimate collaboration between the employers, the agreement is deemed illegal without any inquiry into its competitive effects. Legitimate joint ventures (including, for example, appropriate shared use of facilities) are not considered *per se* illegal under the antitrust laws.
>
> To repeat, a policy that permits poaching on an annual basis but bars it during the NFL season is not a "naked" no-poaching agreement. As discussed, plaintiff's proposed amendment fails to allege facts supporting any plausible inference that the anti-tampering policy actually functioned as a "no-poaching agreement . . . separate from or not reasonably necessary to a larger legitimate collaboration" as contemplated by the DOJ Guidance.

*Kelsey K. v. NFL*, 2017 WL 3115169, at *3-4 (citations omitted); *see also In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1117 (N.D. Cal. 2012) ("[T]he bilateral ['Do Not

Cold Call'] agreements were not limited by geography, job function, product group, or time period, and *were not related to a collaboration between defendants*." (emphasis added)). Similarly, the franchise agreements here allegedly were part of the overall scheme of "legitimate collaboration" between franchisees operating under the umbrella of the same brand.

Finally, even if a *per se* approach could be applied, the plaintiff has failed sufficiently to allege the sort of explicit, comprehensive wage-fixing compact that has been found to sustain claims in no-poaching cases under that rubric. The complaint here merely alleges in a very general fashion that no-poaching agreements have had some broad effect in depressing wages of employees in the fast-food industry on a macro scale. He has not alleged that franchisees in any relevant market, or nationally, actually met to fix wages or establish uniform wage scales or caps that all participants in the scheme would adhere to. The allegations here contrast sharply with the specific allegations of broad, explicit wage-fixing agreements in cases such as *In re Animation Workers Antitrust Litigation*, 123 F. Supp. 3d 1175 (N.D. Cal. 2015), where the plaintiffs alleged that a cabal of half a dozen major movie studios "conspired to suppress compensation in two ways. First, Defendants allegedly entered into a scheme not to actively solicit each other's employees. Second, Defendants allegedly engaged in 'collusive discussions in which they exchanged competitively sensitive compensation information and agreed upon compensation ranges,' which would artificially limit compensation offered to Defendants' current and prospective employees," *id.* at 1181. The allegations there included comprehensive, regular collaborations by executives and human resource officers of the defendant studios to determine uniform wage schedules that they agreed to follow. *See In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d at 1184-85.

The plaintiff's complaint fails to plead facts sufficient to support the proposition that the franchise agreements' no-poaching provisions are unreasonable *per se*.

C.

As noted above, the Sixth Circuit has explained that the "quick look" analysis is merely a species of the rule of reason that allows some latitude for a less rigorous delineation of the relevant market. But even under that relaxed standard the plaintiff still must establish that the agreement in question constitutes an unreasonable restraint of trade. The plaintiff's complaint falls short of that mark as well.

The facts here contrast with those in the cases cited by the plaintiff, which comprised allegations of far more onerous and directly enforced employment restraints. For example, in *Butler v. Jimmy John's Franchise, LLC*, 331 F. Supp. 3d 786 (S.D. Ill. 2018), the plaintiff "explicitly stated in his complaint that (1) his store required him to sign an employee non-competition agreement, which the franchisees force on their employees in order to enforce the no-hire provision between stores; (2) his store reduced his hours to about four per week, despite Butler's protests; and (3) because of the non-competition agreement — which is in place because of the no-hire provision — Butler could not transfer to another Jimmy John's store or even another sandwich shop in his area." 331 F. Supp. 3d at 793. In this case, there are no such dramatic allegations of an onerous non-compete that was applied to restrain the plaintiff from seeking alternate employment, nor was he subjected to any drastic depression of his wages or working hours after he was hired (in fact, the plaintiff here positively alleges that his job title and pay were increased twice by promotions during his tenure).

Similarly, in *Deslandes v. McDonald's USA, LLC*, 2018 WL 3105955 (N.D. Ill. June 25, 2018), the court concluded that the facts advanced possibly could sustain a claim under the "quick look" approach, if that analysis eventually were found to apply, but the facts there were far more compelling:

The next question, then, is whether plaintiff has plausibly alleged a restraint that might be found unlawful under quick-look analysis. The Court thinks she has. Even a person with a rudimentary understanding of economics would understand that if competitors agree not to hire each other's employees, wages for employees will stagnate. Plaintiff herself experienced the stagnation of her wages. A supervisor for a competing McDonald's restaurant told plaintiff she would like to hire plaintiff for a position that would be similar to plaintiff's position but that would pay $1.75-2.75 more per hour than she was earning. Unfortunately for plaintiff, the no-hire agreement prevented the McOpCo from offering plaintiff the job. When plaintiff asked her current employer to release her, plaintiff was told she was too valuable.

*Deslandes*, 2018 WL 3105955, at *7.

The complaint in this case contains no similar allegations. Ogden does not allege that he tried to obtain employment at another Little Caesar franchise, let alone that he was offered a job for more pay that he had to refuse, or that another employer would hire him but for the no-poaching clause. The "quick look" approach may provide refuge for near-miss *per se* antitrust plaintiffs, but the framework still requires an equivalent amount of obviousness that is lacking here. That is especially so here, where the agreements display both vertical and horizontal components, and therefore require a more in-depth analysis to determine unreasonableness.

## D.

As noted, the "default position" for most antitrust cases is the application of the rule of reason. "To determine whether a restraint violates the rule of reason, . . . a three-step, burden-shifting framework applies." *Ohio v. American Express*, 138 S. Ct. at 2284. "Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market. If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint. If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Ibid.* (citations omitted). "The plaintiff[] can make [the initial] showing directly or

indirectly." *Ibid.* "Direct evidence of anticompetitive effects would be proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market." *Ibid.* "Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition." *Ibid.*

The facts alleged in the complaint, no matter how generously construed, fall far short of the required showing to sustain an antitrust claim, principally because the plaintiff has not put forth any allegations to define the scope of any relevant market, or to show that any anti-competitive effects of the agreements are not negated by the pro-competitive effects on interbrand competition. Thus, no matter how well sustained by the evidence, the allegations could not survive scrutiny under the rule of reason. *National Hockey League*, 325 F.3d at 720 ("The antitrust laws were enacted for 'the protection of *competition*, not *competitors*.' Therefore, appellees have failed to establish that the Van Ryn Rule has a significant anticompetitive effect on a relevant market." (quoting *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990)); *Williams v. Nevada*, 794 F. Supp. 1026, 1033 (D. Nev. 1992), *aff'd sub nom. Williams v. I.B. Fischer Nevada*, 999 F.2d 445 (9th Cir. 1993) ("Under the rule of reason, an inquiry must be made as to whether the purpose and effect of the hiring agreement were anti-competitive. The purpose of the agreement is to prevent the franchises from hiring away each other's management employees. This agreement does not bar competitors of Jack-in-the-Box from hiring away these managerial employees. It only prohibits movement between the various franchises and since they are not competing with each other, the agreement cannot be anti-competitive."); *see also Butler*, 331 F. Supp. 3d at 797 ("[I]f the evidence of franchisee independence is weak, or if Jimmy John's carries its burden under the quick look approach, then the rule of reason may rear its head and burn this case to the ground.").

E.

The defendants also argue that the complaint falls short of alleging an antitrust injury, where the plaintiff suggests, at most, that he was merely unhappy with the terms of his employment and decided to take a job with another employer, without alleging that he ever actually was restrained from seeking a transfer or other employment by the defendants. The plaintiff responds that he has sufficiently alleged an "antitrust injury" where he asserts that the no-poaching clause in the franchise agreement artificially depressed his wages and suppressed his employment mobility, which had the effect of causing him to work for lower wages than he could have obtained in a fully competitive labor market.

"[R]egardless of which approach is used [in analyzing the claims], the plaintiff must also establish that the illegal conspiracy caused injury to the plaintiff." *Se. Milk Antitrust*, 739 F.3d at 270. Here, Ogden has not made the required showing, because even taken in the most generous light, the allegations of the complaint suggest nothing more sinister than that the plaintiff, unsatisfied with the conditions of his employment, simply decided to seek, and found, work elsewhere. Those allegations are not of the quality or specificity that have been found by other courts to sustain the pleading of a cognizable anti-trust injury. "An antitrust injury is an injury that is 'of the type the antitrust laws were intended to prevent and . . . flows from that which makes defendants' acts unlawful.'" *Encana Oil & Gas (USA) Inc. v. Zaremba Family Farms, Inc.*, 736 F. App'x 557, 560 (6th Cir. 2018), *reh'g denied* (June 18, 2018), *cert. denied*, No. 18-475, 2019 WL 271965 (U.S. Jan. 22, 2019) (quoting *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)). "[I]njury, although causally related to an antitrust violation, nevertheless will not qualify as 'antitrust injury' unless it is attributable to an anti-competitive aspect of the practice under scrutiny." *Atlantic Richfield*, 429 U.S. at 334.

Regardless of whether the challenged agreement may have been unlawful, the plaintiff has not validly pleaded an antitrust injury where he has not offered any facts to show that the agreement precipitated any specific wage or opportunity loss to him. That is particularly apparent where, as here, the plaintiff contends that he had no knowledge of the no-poaching agreement, and that he never was subjected to any invocation of the clause by either his former or any prospective employer. That deficiency stands sharply against the facts in *Butler* and *Deslandes*, where the agreements explicitly were invoked to bar the plaintiffs from transferring to other stores (and in *Butler* allegedly forced plaintiff out of the "sandwich shop" industry altogether).

In the *Butler* case, several facts central to the outcome were present, which are nowhere evident here. There, the franchise agreements contained onerous enforcement provisions against franchisees who violate the no-poaching provision. But the Jimmy John's franchisees also had forced all of their employees to sign non-competition agreements to effectuate the terms of the franchise no-poaching scheme; and those non-compete clauses not only prohibited every employee from working for another Jimmy John's store, but also barred them from seeking work at any other employer in the "sandwich shop" industry, without geographic reservations, for an entire year. Butler alleged that he

> used to work at a Jimmy John's franchise owned by Kidds Restaurant, Inc. While at the store, Butler worked as both a delivery driver and as an in-store employee. Over the course of about 17 months, Butler's supervisor reduced Butler's hours to about four hours of work per week, even though Butler wanted to work more. But because Butler was subject to the non-compete agreement, he was unable to transfer to a competing Jimmy John's franchisee or to another sandwich store — so his only options were to (1) stay stagnant at his current Jimmy John's store; or (2) quit and start another entry-level job at a non-sandwich shop. Butler ended up quitting.

*Butler*, 331 F. Supp. 3d at 790-91. The complaint here does not allege that Little Caesar franchises implemented any such draconian non-compete agreement with their employees, or that the plaintiff ever was subjected to any consequences of such a provision.

Similarly, the plaintiff in *Deslandes* alleged that she directly was harmed by the no-poaching agreement when it was invoked by the McDonald's parent entity and the franchisee where she first was hired to squash her hopes of transferring to another store — which already had positively responded to her application — after her original store first offered, then withdrew the opportunity for management training. When the plaintiff received an offer from another McDonalds franchisee for a higher paying job, the corporate office called to tell her she could not take it unless her current employer signed off. The plaintiff then alleged:

> When plaintiff arrived at work the next day, she asked Bam-B to release her to work for the McOpCo restaurant. Bam-B said no, because plaintiff was "too valuable." Plaintiff continued to work for Bam-B for several months, but, ultimately, she took an entry-level job with Hobby Lobby for less money, $10.25 per hour. Plaintiff alleges that some of the skills she developed as a manager of a McDonald's outlet were not transferable to management positions at employers outside of the McDonald's brand, so she had to start over at the bottom elsewhere.

*Deslandes*, 2018 WL 3105955, at *3. In this case, the plaintiff has not alleged any similar facts to show that he ever attempted to — or even considered — transferring to another Little Caesar franchisee location. Nor has he alleged that any restrictive condition of his employment drove him to seek work outside the industry, by preventing him from being hired by any out-of-brand competitor.

As the Sixth Circuit has held, the antitrust plaintiff who cannot show that the defendants' anti-competitive collusion actually deprived him of an opportunity to market his services has not made the required connection between the unlawful agreement and his injury. *Zaremba Family Farms*, 736 F. at 563-64 (noting that "antitrust plaintiffs are required to show 'that the conspiracy caused them an injury for which the antitrust laws provide relief,' not just that the defendant was up to no good") (citations omitted). That case was decided at the summary judgment stage ("[S]ince the Zarembas have not pointed to any competent summary judgment evidence from which a reasonable juror could infer that they suffered an injury in the months after the companies

walked away from their deal, their price-depression theory fails.").  But the point remains that a plaintiff must allege facts that plausibly suggest the existence of all the elements of his claim. *Twombly*, 550 U.S. at 547.

In *Kelsey K. v. NFL*, the district court found the allegations of injury insufficient where the plaintiff's amended pleadings failed to explain specifically how the no-poaching policy was applied to deny her any transfer opportunity that she had sought.  The plaintiff's proposed amended complaint alleged that a representative of an NFL franchise cheerleading team told her that if she did not make the cut, the no-poaching clause prevented her from trying out for another team.  She alleged that when she "was not selected for a second year on the 49ers cheerleading team despite trying out, and did not try out for another team, including Defendant Raiders, despite wanting to do so."  *Kelsey K.*, 2017 WL 3115169, at *5.  The court held that the allegation did not allege an antitrust injury.

> The peculiar phrasing of the allegation makes it impossible to infer any reason why it was not wholly plaintiff's own decision to not tryout for another club after the 49ers declined to re-hire her. Taken as a whole, the proposed amendment simply cannot support any plausible inference that plaintiff missed out on any employment opportunity as a result of any purported no-poaching agreement between NFL clubs.

*Ibid.* (citations omitted).

As these cases illustrate, the allegations in Ogden's complaint do not establish a plausible connection between the defendants' alleged conduct and the injury he says he endured.

### III.

Perhaps the case most on point here is *Bell Atlantic v. Twombly*, in which the Supreme Court inaugurated our modern "plausibility" pleading standard.  In that case, which was an anti-trust action, the Court famously observed that a complaint does not sufficiently set forth any

plausible claim for relief where it alleges facts that are entirely as consistent with innocent, merely parallel conduct as they are with an illegally pernicious conspiracy:

> [In *Twombly*,] [t]he Court held the plaintiffs' complaint deficient under Rule 8. In doing so it first noted that the plaintiffs' assertion of an unlawful agreement was a "legal conclusion" and, as such, was not entitled to the assumption of truth. Had the Court simply credited the allegation of a conspiracy, the plaintiffs would have stated a claim for relief and been entitled to proceed perforce. The Court next addressed the "nub" of the plaintiffs' complaint — the well-pleaded, nonconclusory factual allegation of parallel behavior — to determine whether it gave rise to a "plausible suggestion of conspiracy." *Acknowledging that parallel conduct was consistent with an unlawful agreement, the Court nevertheless concluded that it did not plausibly suggest an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior.* Because the well-pleaded fact of parallel conduct, accepted as true, did not plausibly suggest an unlawful agreement, the Court held the plaintiffs' complaint must be dismissed.

*Iqbal*, 556 U.S. at 680 (emphasis added; citations omitted). The Court in *Twombly* was referring to the idea of conscious parallelism, but the underlying principle infests the pleadings here as well. The plaintiff has not alleged facts under an applicable antitrust theory from which one plausibly could find that the no-poaching provision in the defendants' franchise agreements amount to an unreasonable restraint of trade. And particularly as to the consequences suffered by the plaintiff, the complaint suggests very little more than that the plaintiff was unhappy with the conditions of his employment and decided to seek work elsewhere, which he eventually found, albeit at a lower rate of pay than in his former job. Nothing in his extensive pleadings positively establishes that the plaintiff's departure from his job was due to anything other than his own choice to seek better work with a new employer; so far as they go, those circumstances are not sufficient to allege a plausible claim for relief under any legal theory alluded to in the complaint.

Accordingly, it is **ORDERED** that the defendants' motion to dismiss (ECF No. 20) is **GRANTED**.

It is further **ORDERED** that the complaint it **DISMISSED WITH PREJUDICE**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Date:   July 29, 2019

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first-class U.S. mail on July 29, 2019.

s/Susan K. Pinkowski
SUSAN K. PINKOWSKI